# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

KEITH MCMANNIS,

        Plaintiff,

v.

        Civil Action 2:20-cv-4797
        Judge Michael H. Watson
        Magistrate Judge Jolson

COMMISIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Keith McMannis, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I. BACKGROUND

Plaintiff protectively filed his application for SSI in March of 2018, alleging disability beginning February 14, 2017. (Doc. 12, Tr. 199–204). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a video hearing on September 24, 2019. (Tr. 33–80). On October 18, 2019, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 15–27). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on September 14, 2020 (Doc. 1), and the Commissioner filed the administrative record on March 5,

2021 (Doc. 12). Plaintiff filed his Statement of Errors on April 19, 2021, and this matter is now ripe for consideration. (*See* Docs. 13, 15, 16).

### A. Relevant Hearing Testimony

Plaintiff's statement of errors concerns his mental health issues stemming from his hospitalization for necrotizing fasciitis in early 2017. Accordingly, the Undersigned limits her discussion of the record to the same.

The ALJ summarized Plaintiff's relevant hearing testimony:

> [ ] [Plaintiff] testified at a hearing, and he stated that he is unable to work because of mental trauma related to his bout with flesh-eating bacteria. . . . In terms of his mental complaints, he stated that he has anxiety around people, and he only leaves the house to go to appointments. He believes people are staring at him because of his scars. He has daily panic attacks.

(Tr. 21).

### B. Relevant Medical Evidence

Plaintiff went to the emergency room on February 12, 2017, complaining of a sore throat. (Tr. 313). He received antibiotics and was sent home. (*Id.*). He subsequently developed facial swelling, pain, and difficulty swallowing. (*Id.*). So he returned to the emergency room. (*Id.*). A CT scan revealed extensive air in his neck, and he was life flighted to Ruby Medical Center in Morgantown, West Virginia. (*Id.*). Doctors there concluded that Plaintiff had a left facial and deep neck infection likely secondary to a necrotic left lower molar with resulting sepsis. (Tr. 330). Doctors sedated and intubated Plaintiff for surgery. (*Id.*). Surgeons extracted his teeth, cleansed and drained his neck, and inserted a wound vac. (*Id.*). Plaintiff remained intubated and, over the course of several days, surgeons continued to cleanse and drain his neck. (*See* Tr. 334, 356–57, 396). Doctors then attempted to remove Plaintiff's intubation but were unable to do so because Plaintiff could not breathe on his own. (Tr. 396). Doctors finally removed Plaintiff's intubation on February 22, 2017. (Tr. 417). Plaintiff was not discharged until nine days later. (Tr. 473).

2

Roughly two months later, Plaintiff sought help for his mental health. (Tr. 715–16). The ALJ summarized Plaintiff's mental health treatment notes and examinations:

> As for his mental complaints, treatment with Dr. Balgo indicated no abnormalities in [Plaintiff]'s mental status examinations (Exhibits 3F and 20F). [Plaintiff] had treatment for his mental complaints at Hillcrest Outpatient Services. During a January 2018 office visit, [Plaintiff]'s concentration/attention span was considered poor, but during that same assessment is [sic] attention and concentration was adequate. His thought process, thought content, association, judgment, and insight were all normal. His memory was intact (Exhibit 5F/6). Subsequent office visits with this provider revealed identical mental status findings (Exhibit 7F/17).
>
> In May 2018, [Plaintiff] underwent a consultative examination with David Bousquet MEd, who diagnosed disruptive mood dysregulation disorder, recurrent, moderate; posttraumatic stress disorder; and unspecified anxiety disorder (Exhibit 6F/7). He summarized [Plaintiff]'s mental status examination as follows:
>
>> [Plaintiff]'s speech was 100% understandable. [Plaintiff]'s speech was sustainable and goal oriented. However, he did tend to speak rapidly. [Plaintiff] did not have any difficulties with receptive or expressive language. The associations were organized.
>>
>> His affect was appropriate to the nature and content of our discussions. His mood was anxious and fearful with underlying features of sadness. He was noted to be scanning the examiners office frequently but was easily refocused. At times he was noted to be restless and fidgety.
>>
>> [Plaintiff]'s cognitive abilities were screened. [Plaintiff] was asked to remember Hat, Sun, and Bell. After 5 minutes [Plaintiff] was able to recall hat and sun.
>>
>> Digits Forward —5
>>
>> Digits Backward —3
>
> Exhibit 6F/5. The lack of qualitative deficits in verbal communication, nonverbal communication, and social interaction belies the presence of an autism spectrum disorder.
>
> During a recent office visit at Hillcrest in April 2019, [Plaintiff]'s mental status examination showed normal thought process, thought content, association, judgment, and insight (Exhibit 19F/9). His intelligence was estimated as average, and his capacity for activities of daily living was independent (Exhibit 19F/9). His attention and concentration were considered impaired, but his memory was intact.

> The undersigned finds that poor concentration is adequately accommodated by limiting [Plaintiff] to simple, routine and repetitive tasks requiring only simple decisions with no fast-paced production requirements and few workplace changes.

(Tr. 23–24).

C. **The ALJ's Decision**

The ALJ found that Plaintiff has not engaged in substantial gainful activity since March 6, 2018, the application date. (Tr. 17). The ALJ determined that Plaintiff suffered from the following severe impairments: degenerative disc disease, anxiety disorder, depressive disorder, posttraumatic stress disorder, migraines, obesity, necrotizing fasciitis, and epilepsy. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 18).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> The [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: stairs and ramps occasionally; no ropes, ladders and scaffolds; balancing, stooping, kneeling, crouching and crawling occasionally; avoid concentrated vibration, excessive noise and irritants such as concentrated fumes, odors, dust, gases, or poor ventilation; avoid all exposure to hazards such as heavy, dangerous machinery and unprotected heights; limited to simple, routine and repetitive tasks; requiring only simple decisions; with no fast paced production requirements and few workplace changes; and occasional contact with coworkers and supervisors; and no contact with the general public.

(Tr. 20).

As for the relevant opinion evidence, the ALJ first considered the opinion of David Bousquet, who consultatively examined Plaintiff on May 29, 2018:

> To the extent Mr. Bousquet's consultative examination can be considered a medical opinion, it is not persuasive (Exhibit 6F). The undersigned has considered the objection to the consultative examination in the [Plaintiff]'s brief:
>
>> While the CE did find impairments that should be considered "marked," we object that his findings represent a level at which McMannis cannot operate. The CE was a one-time examination by a non-psychologist. In another case, he changed his report,

4

> apparently to suit SSA; his treating therapist also found autistic disorder (5F1 3/2/18) that the CE didn't seem to address; the CE did not have benefit of more recent Hillcrest records, and Amons' letter 7F.
>
> Exhibit 16E. First, the undersigned agrees that the consultative examiner's **_could be_** considered marked, but they could also be considered mild. The primary issue is that Mr. Bousquet failed to quantify the degree of limitations he found in the functional domains he assessed. He used phrases such as, "there will be times when he will have difficulties," or " [Plaintiff] would be expected to have difficulties." (Exhibit 6F/7–8). The language used in the narrative sections to describe the limitations is undefined, vague and not stated in vocational terms. For these reasons alone, the undersigned finds the consultative examiner's opinion unpersuasive.
>
> The undersigned rejects the argument that the consultative examiner, "in another case…changed his report, apparently to suit Social Security Administration." There is no scenario where such an objection would be appropriate. First, [Plaintiff]'s representative has not provided proof that the consultative examiner ever changed a report to suit the Social Security Administration, and second, such proof would be inadmissible (if it even existed) because it would contain personally identifiable information of another [Plaintiff].
>
> The undersigned rejects the objection that the consultative examiner failed to consider other evidence because consultative examiner's [sic] routinely base their findings on a one-time examination. It is the undersigned's responsibility to consider those findings in light of the other available evidence, both medical and non-medical. Even though the consultative examiner's medical opinion is not persuasive, the objective findings from the consultative examination are relevant evidence, and, as discussed above, the relatively benign findings on the mental status examination are factors that suggest [Plaintiff]'s mental complaints are not as debilitating as he has alleged.
>
> In contrast, the prior administrative findings offered by the State Agency Psychological Consultants are persuasive (Exhibits 1A and 3A). As discussed above, these experts offered PRT findings that are consistent with the objective consultative examination findings and [Plaintiff]'s mental status examinations from treatment. Their narrative reports are equally persuasive. The consultative examiner did not quantify the degree of limitations in his opinion, but the State Agency Psychological Consultants, armed with the objective findings from the consultative examination, were able to quantify the degree of limitations. Their findings are consistent with the objective findings from the consultative examination, particularly memory and concentration testing. They are also consistent with treatment records that showed [Plaintiff] was independent in his activities of daily living and was of average intelligence.

(Tr. 25).

Relying on the VE's testimony, the ALJ concluded that Plaintiff could not perform his past relevant work as a department manager or jewelry salesperson, but could perform jobs that exist in significant numbers in the national economy, such as an office helper, marker, and a mail clerk. (Tr. 25–27). He therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, since March 6, 2018, the date the application was filed (20 CFR 416.920(g))." (Tr. 27).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff asserts that the ALJ did not properly consider his panic attacks. (Doc. 13 at 15– 16). Specifically, Plaintiff asserts that the ALJ "failed to evaluate the likely effects of panic attacks on [the] RFC." (*Id*. at 15). As discussed below, the Undersigned agrees.

A claimant's RFC is an administrative finding of fact reserved to the Commissioner. 20 C.F.R. § 416.927(d). It describes "the most that the claimant can do after considering the effects of all impairments on the ability to perform work-related tasks." *Redd v. Comm'r of Soc. Sec.*, No. 1:20-CV-222, 2021 WL 1960763, at *3 (W.D. Mich. May 17, 2021) (citing 20 C.F.R. § 404.1545(e)). "'The ALJ is charged with the responsibility of determining the RFC based on her evaluation of the medical and non-medical evidence.'" *Redd*, 2021 WL 1960763, at *3 (quoting *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)). Important here, "[t]he ALJ should consider all the claimant's impairments, including those that are not severe, in evaluating the claimant's RFC." *Redd*, 2021 WL 1960763, at *3 (citing *Hedges v. Comm'r of Soc. Sec.*, 725 F. App'x 394, 395 (6th Cir. 2018)).

Plaintiff, throughout 2017 and 2018, reported panic attacks to his treating providers. For example, treatment notes from July 2017 show that Plaintiff reported "panic attacks" and "developed PTSD from being sick so long and [] intubated for 19 days." (Tr. 721). Likewise, notes from a January 2018 therapy session provide that Plaintiff:

> started to have [ ] depressive symptoms and anxiety since he had the necrotizing fasciitis . . . and since that he had all these high major surgery and affects his life and patient is not able to function and to work and he started to have anxiety symptoms and depression [ ] has been having panic attacks[,] anxiety[,] and irritability[,] and it is very hard to live [ ] because of his agitation and aggression[,] and he has panic attacks including irritability . . everything can set him off[,] and he has [heart] [] racing and palpitation with shortness of breath [] during the panic attacks.

(Tr. 758). Similarly, May 2018 consultative exam notes provide:

> The claimant describes difficulty relaxing. The claimant states that when anxious "My mind is always going and thinking." He states "sometimes it feels like the walls are closing in on me." He describes a rapid heart rate, he will sweat, and he has difficulties breathing and becomes restless and fidgety. . . . He reports that he finds himself fearful but could not identify any specific fears. He does describe having anxiety attacks and they occur about twice a week with his current medication. He states that where he lives is "near where the life [f]light people go and my house is right there and whenever I hear that I get flashbacks of what happened to me." He

states that these anxiety attacks will last up to "a few hours." When he has one he will shake, he gets jittery, he has difficulties breathing, and he becomes sweaty. . . .

(Tr. 777).

Plaintiff also testified as to his panic symptoms at his September 2019 hearing:

Q. Correct me if I'm wrong, but one of your legs, or maybe both of 'em were sort of twitching or moving or something. How often do you do that sort of thing?
A. Almost constantly, especially when I'm having anxiety.
Q. And how often do you have anxiety?
A. Daily.
Q. How often do you have—do you have panic attacks?
A. Yes, I do.
Q. How often do you have those?
A. I'd say, I, I have anxiety that bothers me constantly, but, I would say, you know, several times a week. A good five to six times a, a, a week. It can be—the smallest thing can set one off. I can—one of the things that does set them off is we live in town not far from where the Life Flights land, and I—they come over, low over the house and it shakes the windows of the house, and I can hear one coming and I just, reminds me of everything that happened and that causes them, at times.

(Tr. 64). His mother testified similarly:

Q. This job that he used to have a call center, do you think he could do that?
A. I don't think he could do that with his anxiety problems. Now, he has anxiety attacks, 'couple times a day, I would say. When he's, you know, and there are times when he has them he'll come downstairs and he's a mess, shaking, clapping his hands, kinda. If the helicopter—you flew by helicopter from here to Morgantown when he had the flesh-eating bacteria. When that helicopter flies, it flies over our house to land and pick up people and take to the hospital. That, that gives him an anxiety attack. Heavy breathing, no—panting, and just. It's awful
Q. How was he different in the way he acts since the necrotizing fasciitis?
A. He didn't use to have anxiety attacks. . . .
Q. And what is it that sets him off?
A. If you ask his opinion, he'll go, I don't know, and that will set him off. Things in the news will set him off. You know, things that I think are minor, are very exaggerated reactions from him. He flies off the handle very easily.

(Tr. 72–73).

The ALJ found Plaintiff's anxiety disorder and PTSD to be severe. (Tr. 17). And presumably, Plaintiff's panic attacks are symptoms of those conditions. Indeed, the ALJ expressly acknowledged Plaintiff's testimony that he experienced "daily panic attacks." (Tr. 21). Yet, the

8

ALJ did not substantively address these symptoms or explain whether they would affect Plaintiff's ability to work. "As other Courts have explained, 'without some explanation in the record as to how plaintiff can suffer from a severe impairment which by definition must have more than a minimal effect on plaintiff's ability to work and why such severe impairment would not have had any limitation on plaintiff's ability to . . . [fulfill the necessary functions of] the jobs identified by the vocational expert, the decision cannot stand.'" *Bryant v. Saul*, No. 1:20-CV-1394, 2021 WL 1409214, at *14 (N.D. Ohio Apr. 7, 2021), *report and recommendation adopted sub nom. Bryant v. Comm'r of Soc. Sec.*, No. 1:20-CV-1394, 2021 WL 1406364 (N.D. Ohio Apr. 14, 2021); *see also Kilgore v. Saul*, No. 1:19-CV-168-DCP, 2021 WL 932019, at *9 (E.D. Tenn. Mar. 11, 2021) (noting that, while the ALJ was not required to discuss each piece of data in the opinion, the ALJ erred because he "reviewed the medical record regarding [p]laintiff's chronic migraines, [but] failed to make any findings or specifically consider the impact of her headaches in the RFC determination").

The Commissioner argues, *inter alia*, that Plaintiff's reports of panic attacks were inconsistent. (*See, e.g.*, Doc. 15 at 6 (asserting that Plaintiff complained of panic attacks but later "contradicted his claims" at a subsequent appointment); *id*. at 7–8 (asserting that Plaintiff's hearing testimony is not supported by the record)). The Commissioner additionally asserts that "the record shows that [Plaintiff]s mental impairments improved with treatment." (*Id*. at 6). The problem with these arguments is that they come from the Commissioner and not the ALJ. If the ALJ viewed Plaintiff's panic and anxiety symptoms as inconsistent or believed they improved with medication or treatment, he had a duty to say so. *See Adams v. Astrue*, No. 5:11CV00904, 2012 WL 2025604, at *9 (N.D. Ohio May 14, 2012), *report and recommendation adopted*, No. 5:11 CV 904, 2012 WL 2026764 (N.D. Ohio June 1, 2012) (quoting SSR No. 96-8p, 1996 SSR LEXIS 5, at *19) (noting

9

that an ALJ is required to "'explain how any material inconstancies or ambiguities in the evidence in the case record were considered and resolved'").

True, the ALJ noted that objective mental exam findings undermined Plaintiff's subjective complaints. (*See, e.g.*, Tr. 19, 24, 25). The ALJ also noted that the state agency psychologists found Plaintiff capable of daily life activities. (Tr. 25). But these statements do not sufficiently "articulate . . . his analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Reed v. Comm'r of Soc. Sec.*, No. 1:16-CV-572, 2017 WL 1531872, at *6 (W.D. Mich. Apr. 28, 2017) (quotation marks and citation omitted).

That is especially so because the ALJ accommodated some of Plaintiff's mental health issues but not others. For example, the ALJ accommodated Plaintiff's concerns with his physical appearance by "limiting his contact with supervisors and coworkers and precluding contact with the public." (Tr. 23). In doing so, the ALJ noted that Plaintiff "attributed his social anxiety, in part, to his appearance." (*Id.*). The ALJ also accommodated Plaintiff's "poor concentration" "by limiting [him] to simple, routine and repetitive tasks requiring only simple decisions with no fast-paced production requirements and few workplace changes." (Tr. 24).

But the ALJ does not discuss why Plaintiff's anxiety attacks, panic symptoms, or anxiety symptoms unrelated to Plaintiff's physical appearance do not require accommodations. Nor did he discount the credibility of Plaintiff's subjective reports of these specific symptoms. *Cf. Wood v. Comm'r of Soc. Sec.*, No. 2:18-CV-1098, 2019 WL 3543087, at *8–10 (S.D. Ohio Aug. 5, 2019), *report and recommendation adopted*, No. 2:18-CV-1098, 2019 WL 4193361 (S.D. Ohio Sept. 4, 2019) (finding that ALJ properly discounted plaintiff's credibility by "specifically consider[ing]" plaintiff's "conservative mental health treatment and improvement of symptoms with such treatment," "activities of daily living," and explaining how each non-exertional limitation

accommodated plaintiff's mental health issues); *O'Day v. Comm'r of Soc. Sec.,* No. 3:17CV1980, 2019 WL 1324414, at *25 (N.D. Ohio Mar. 25, 2019) (holding that ALJ did not err in accommodating plaintiff's panic attacks because ALJ found, *inter alia*, "that [p]laintiff's symptoms and limitations were exaggerated as [p]laintiff reported that she took her children to a minor league baseball game and stayed two hours without feeling panicked or overwhelmed"); *Perdue v. Colvin*, No. CV 15-14006, 2017 WL 362668, at *4 (E.D. Mich. Jan. 9, 2017), *report and recommendation adopted sub nom. Perdue v. Comm'r of Soc. Sec.*, No. 15-14006, 2017 WL 976790 (E.D. Mich. Mar. 14, 2017) (noting that ALJ found Plaintiff's reports of panic attacks not entirely credible "because she did not appear to have continuous treatment for them, because there were no documented episodes of her panic attacks in the record and no related emergency room visits or psychiatric hospitalizations, and because her medication has been shown to improve the symptoms").

The Court could speculate that the ALJ believed that the RFC accommodated Plaintiff's panic attacks—or maybe the ALJ found that these symptoms did not warrant any restrictions at all. But "such speculation would be inappropriate." *Adams*, 2012 WL 2025604, at *9. Nor is it the "Court's role to weigh the evidence and make a determination regarding [Plaintiff's] [anxiety attacks and panic symptoms], alone or in combination with [his] other impairments, are disabling." *Bryant*, 2021 WL 1409214, at *14. So the Court is left "[w]ithout an explanation from the ALJ as to how he reached his decision not to include a limitation to address [Plaintiff's] panic attacks." *Adams*, 2012 WL 2025604, at *9. As a result,"[t]he Court is unable to adequately to review [the ALJ's] RFC determination." *Id*. Remand is necessary.

To be clear, the Court is not recommending that the ALJ's decision be remanded because Plaintiff's panic attacks and corresponding symptoms warrant additional RFC limitations. Rather,

should the District Judge adopt this Report and Recommendation, the ALJ, on remand, should specifically consider the effect of Plaintiff's anxiety attacks and panic symptoms on Plaintiff's ability to perform work-related activities.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: July 7, 2021            /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE